***********
Upon review of the competent evidence of record with reference to the errors assigned and finding no good grounds to rehear the parties or their representatives or to receive further evidence, the Full Commission, upon reconsideration of the evidence, reverses in part the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in the Pre-trial Agreement as:
 STIPULATIONS *Page 2 
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. Defendant-employer was insured by The Hartford at the time of injury.
3. Plaintiff was employed by defendant-employer as a general worker in the bookstore. He had been so employed since May 9, 1983.
4. While working for defendant-employer, plaintiff injured his back on an unknown date in April 2000 when he picked up a box of books.
5. Plaintiff's average weekly wage was $354.69, which yields a weekly compensation rate of $236.48.
6. Plaintiff received temporary total disability benefits from August 27, 2002 through November 11, 2002 in the amount of $236.48 per week.
 ***********
The following were entered into evidence as:
 STIPULATED EXHIBITS a. The Pre-trial Agreement, marked as stipulated exhibit 1.
 b. Industrial Commission forms and correspondence related to this matter collectively paginated 1-20, marked as stipulated exhibit 2.
 c. Plaintiff's medical records related to this matter collectively paginated 1-295, marked as stipulated exhibit 3.
 d. Records of the indemnity benefits paid plaintiff in this matter, marked as stipulated exhibit 4.
 e. Records of the medical benefits paid plaintiff in this matter, marked as stipulated exhibit 5. *Page 3 
 f. Discovery responses related to this matter, marked as stipulated exhibit 6.
 *********** ISSUES PRESENTED
1. Whether the back surgery plaintiff underwent in September 2005 by Dr. Hadar was related to his work injury?
2. To what compensation is plaintiff entitled for permanent partial disability?
3. Whether plaintiff's request for approval of the September 2005 surgery has been made within a reasonable time?
4. Are defendants entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1?
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 46 years old and had worked for defendant-employer for nearly 25 years. Plaintiff did not graduate from high school and did not receive a GED.
2. Plaintiff had a prior back injury while working for defendant-employer in 1995. Defendant-employer's "Supervisor's Accident Report Form" dated February 20, 1995 reflects that plaintiff injured his back lifting boxes of books on February 16, 1995 and was taken to the hospital. Plaintiff was treated by Dr. James S. Fulghum following this incident. On July 26, 1995 Dr. Fulghum released plaintiff at maximum medical improvement with a 5% permanent partial impairment rating to his back due to a herniated disc at L5-S1, which had resolved without surgery. A Form 21 apparently meant to pay plaintiff for this rating was fully executed but never *Page 4 
submitted to the Industrial Commission for approval. There is no evidence to confirm that Plaintiff was paid for the 5% rating to his back. Dr. Fulghum released plaintiff to return to work with restrictions on July 26, 1995. These permanent restrictions were no lifting over 50 pounds and no frequent bending, twisting, or stooping. Plaintiff returned to work, although it is unclear as to what degree plaintiff's job duties were modified, if at all.
3. Plaintiff sustained a second, similar injury while working for defendant-employer. Plaintiff injured his lower back while picking up a box of books, either on November 8, 1999 or in April of 2000. Plaintiff testified that he could not recall on which date the injury occurred. Based upon the greater weight of the documentary evidence, the Full Commission finds November 8, 1999 to be the date of this injury. Plaintiff sought medical treatment, but continued to work. Medical notes from Wake Medical Center indicate that Plaintiff sought treatment for back pain radiating to his right leg on November 15, 1999 and received an epidural steroid injection.
4. On July 6, 2001, plaintiff returned to Dr. Fulghum, who had treated him for his 1995 injury. Plaintiff reported that he hurt his back again in 1999. Plaintiff told Dr. Fulghum that he was lifting a box from the floor and felt a pop in his back and that he experienced bilateral leg pain with numbness in his feet. Dr. Fulghum placed him on Celebrex and recommended an MRI. The MRI, which was completed on July 11, 2001, indicated that plaintiff had multiple levels of significant canal stenosis due to congenital foreshortening of the pedicles, most advanced at the L4-5 level, as well as a disc protrusion at L5-S1.
5. Upon seeing the MRI results, Dr. Fulghum ordered a lumbar myelogram CT, which he interpreted as being consistent with the MRI. Dr. Fulghum's medical note stated: "The myelogram reveals a highly concentric, focal napkin-ring narrowing at L4-5. He does have some *Page 5 
pedicular shortening of a congenital nature elsewhere, revealing some bulges at multiple levels, but certainly nothing to approach the concentric compression at L4-5."
6. On September 7, 2001 Dr. Fulghum recommended a lumbar laminectomy and decompression, which was scheduled for October 2, 2001. Several days before the scheduled surgery, plaintiff advised Dr. Fulghum that defendant-carrier had directed him to seek treatment from a chiropractor instead of proceeding with surgery.
7. Plaintiff received chiropractic treatment from Dr. Donald E. Austin beginning September 28, 2001. Dr. Austin sent a letter to The Hartford Insurance Company dated October 29, 2001 stating plaintiff had experienced some improvement until October 24, 2001 when he had an exacerbation of symptoms with bilateral leg pain. Dr. Austin recommended that plaintiff return to his family physician for evaluation, but also continue chiropractic treatment.
8. Plaintiff received treatment at Duke University Medical Center by Dr. Michael Haglund, Associate Professor of Neurosurgery and Neurobiology, on April 15, 2002. Plaintiff related a history of doing well until November 8, 1999 when he was lifting a box of books and felt a pop in his back. Plaintiff reported that since that time he had been experiencing back pain, pain radiating down both legs and some pain in his arms. The pain in his legs and arms was intermittent. Plaintiff further reported that he had noticed decreased strength especially in his left leg and that occasionally the leg would drag. Dr. Haglund obtained another MRI, which showed no change when compared to the prior CT myelogram. Plaintiff was administered a lumbar epidural steroid injection on May 23, 2002. In response to written questions, Dr. Haglund on July 1, 2002 indicated he was not clear on whether from a medical legal standpoint plaintiff's condition was causally related to his November 8, 1999 injury, "but according to pt [patient] history is causal." *Page 6 
9. Plaintiff returned to Sandhills in August 2002 for continuing back pain. Plaintiff's treatment history at Sandhills beginning December 13, 2001 is listed in a letter dated January 7, 2005.
10. On September 4, 2002, defendant-carrier authorized Carolina Back Institute to evaluate plaintiff for their pain management program upon the referral of Dr. Haglund. Plaintiff was accepted into the program and began in October 2002.
11. Plaintiff participated in the pain management program at Carolina Back Institute under the care of Dr. Catherine A. Duncan 4 days a week for 4 weeks. Plaintiff completed the program and returned to work on November 11, 2002. Dr. Duncan released plaintiff to return to work with the restrictions of "no lifting greater than 25 pounds occasionally and 15 pounds frequently." He was also given restrictions on bending and recommended to have a 5-minute break every 60 minutes. Dr. Duncan completed an I.C. Form 25R indicating that plaintiff had a 3% permanent partial disability to the back.
12. Dr. Duncan's medical note dated November 5, 2002 indicates that she told plaintiff he had congenital spinal stenosis and chronic low back pain, partially work related but mostly as a result of a pre-existing condition. Dr. Duncan opined during her deposition testimony that plaintiff had a combination of chronic low back pain as a result of the work injury and congential stenosis; that there was no way for her to sort out which was coming from which and that the 3% rating was not based on plaintiff's congential spinal stenosis, but to the work injury which caused his pain.
13. Defendants filed a Form 60 on November 4, 2002 accepting the compensability of plaintiff's claim for an injury on November 8, 1999, which defendants described as "nerve damage back." The Form 60 indicated that plaintiff was out of work and received temporary total *Page 7 
disability benefits beginning August 27, 2002. Prior to accepting plaintiff's claim defendants had already received Dr. Haglund's response to their written questions. Defendants filed a Form 28T dated November 12, 2002. The Form 28T indicated that plaintiff returned to work on November 11, 2002 at reduced wages and was entitled to benefits pursuant to N.C. Gen. Stat. § 97-30, presumably for the reduced hours he worked pursuant to Dr. Duncan's graduated return to work schedule. Defendant-carrier did not pay plaintiff temporary partial disability compensation based on their report (found in the exhibits) of indemnity compensation paid.
14. Plaintiff returned to Dr. Duncan on August 16, 2004 at the request of defendant-carrier. Plaintiff reported worsening pain over the prior three months. Plaintiff complained of numbness and tingling in the right foot and pain radiating into his right lower extremity. Dr. Duncan ordered an MRI, which showed no changes. She discharged plaintiff from her care on September 16, 2004 stating no further treatment was recommended. At the time of this return visit to Dr. Duncan plaintiff had been taken out of work by his family physician and was being prescribed Percocet and Oxycontin.
15. Plaintiff was taken out of work by Dr. Robert McConville at Sandhills from July 28, 2004 through December 1, 2004. There are medical notes from Dr. McConville taking plaintiff out of work from August 3, 2004 and continuing beyond September 1, 2004. However, a "To Whom It May Concern" letter from Dr. McConville specifies the exact period he took plaintiff out of work. Plaintiff returned to work on or about December 2, 2004. Plaintiff's treatment at Sandhills appears to have been authorized by defendants based upon the payment of medical bills from this period and indications in the Sandhills records of contact with defendant-carrier during this period. *Page 8 
16. The Full Commission finds that the treatment plaintiff received at Sandhills Family Practice was causally related to and reasonably necessitated by his compensable injury and did tend to provide some relief and lessen his disability. Defendants are obligated to pay and have paid for (some, if not all) the medical expenses plaintiff incurred at Sandhills. It does not appear from the evidence that plaintiff was paid temporary total disability compensation during the period he was taken out of work by Dr. McConville from July 28, 2004 through December 1, 2004.
17. On November 19, 2004 plaintiff obtained an "evaluation only" from Dr. Paul B. Suh of the North Carolina Spine Center. In the "History of Present Illness" Dr. Suh references a flare up of plaintiff's back pain and the onset of right leg pain on April 27, 2004 when plaintiff was standing at work. There is no evidence that plaintiff alleged a new injury on April 27, 2004. According to Dr. Suh's medical notes, plaintiff had not worked in four months at the time of the visit and was having moderate interference with some basic activities of daily living functions.
18. Dr. Suh diagnosed plaintiff as having lumbar spinal stenosis and lumbar degenerative disc disease. He noted that plaintiff's condition was in no way related to the work incident. However, Dr. Suh's only reference to a triggering event or incident in his medical note was to plaintiff's flare up of pain on April 27, 2004 while standing at work. He does not mention the admittedly compensable injury on November 8, 1999 in plaintiff's history or elsewhere in his medical notes and he only reviewed the previous MRI dated September 3, 2004. Also, the Clinic Appointment Worksheet does not reference the injury date for which the evaluation was being conducted. The Full Commission is unable to determine whether Dr. Suh's medical opinion relates only to the April 27, 2004 flare up. The Full Commission gives no weight to Dr. Suh's opinion with respect to plaintiff's November 8, 1999 injury. *Page 9 
19. Without notifying or asking for authorization from defendants or the Industrial Commission, plaintiff sought medical treatment on his own at UNC Hospitals on December 3, 2004. Plaintiff was initially treated conservatively with a change of medication; a trial TENS unit and an epidural steroid injection before being referred for a neurosurgical evaluation. Plaintiff filed this treatment on his general health insurance.
20. Plaintiff testified that he went to UNC because defendants had sent him to many doctors and many places for treatment and "it wasn't helping and the last doctor that I went to, he turn't me down, so I was in pain that day, so I decided to go to UNC and check myself in." Plaintiff had previously gotten good results from treatment by UNC Hospital when he was a child and he trusted UNC Hospital.
21. Without notifying or asking for authorization from defendants or the Industrial Commission, on September 1, 2005 plaintiff underwent a lumbar laminectomy at the L4-5 and L5-S1 and a right-sided diskectomy at L5-S1. Dr. Eldad Hadar, a board certified neurosurgeon at UNC Hospitals, performed this surgery.
22. Dr. Hadar opined and the Full Commission finds that the surgery was necessary because plaintiff was experiencing significant right leg pain, his examination indicated involvement of the right nerve and the imaging studies supported the need for surgery. Dr. Hadar further testified and the Full Commission finds as fact that the goal for this surgery was to remove pressure from the nerve roots. The pressure on the nerve roots was due to stenosis, degenerative changes and a disc herniation at L5-S1. Plaintiff's stenosis at L4-5 was more significant than at other levels and his herniated disc at L5-S1 was significantly large.
23. Dr. Hadar was of the opinion that plaintiff's pre-existing condition called "foreshortening of pedicles" would not make plaintiff more prone to injury, but would make him *Page 10 
more prone to have an injury become symptomatic because the spinal cord is already stenotic. He opined that the condition shown on the MRI in 2001 was consistent with the MRI he ordered and is the same condition for which he performed surgery. Dr. Hadar testified that a disc herniation is going to be more symptomatic at a smaller size in a patient with congenitally shortened pedicles.
24. Dr. Hadar, in responding to the question of what part of the surgical findings were related to the congenital problems versus other problems, began his response by stating; "Well the congenital problem doesn't necessarily cause any of that. The congenital problem predisposes him to that. . . . So I-I can't tell you to what extent one was related to-what was related to what, but I think that he has-he was less tolerant of whatever had developed in his spine because of his congenital problem." Dr. Hadar's response does not rebut plaintiff's presumption that the surgery was related to his admittedly compensable injury. Defendants admitted on the Form 60 that plaintiff's injury caused "nerve damage back." Relieving the pressure from plaintiff's nerve roots [in his back] was the stated goal of the surgery that Dr. Hadar performed on plaintiff. Dr. Hadar did not opine that the surgery was not related to the November 8, 1999 injury. 25. On October 18, 2005 Dr. Hadar released plaintiff to return to work without restrictions. Dr. Hadar explained that he does not do disability ratings or functional capacity evaluations so his release meant that plaintiff could work according to what he could tolerate.
26. The Full Commission gives greater weight to the opinion testimony of Dr. Hadar over that of Dr. Suh, or over any contrary opinions of Dr. Duncan.
27. The Full Commission finds that the medical care plaintiff received through UNC doctors and the surgery performed by Dr. Hadar were causally related to plaintiff's work related injury on November 8, 1999. The Full Commission further finds that the medical care plaintiff received through Dr. Hadar and UNC doctors was reasonably required and tended to effect a *Page 11 
cure, provide relief and/ or lessen plaintiff's disability. Plaintiff obtained significant pain relief as a result of his surgery.
28. Plaintiff sought no medical treatment after October 18, 2005 until July 25, 2007.
29. On July 25, 2007 plaintiff returned to Dr. Hadar. Dr. Hadar's note from this visit reflects that plaintiff articulated "several nonspecific complaints" related to low back pain. Under "Impression and Plan" Dr. Hadar wrote: "[Plaintiff] seems to be complaining of general fatigue and more intolerance for work." Dr. Hadar also specifically stated and the Full Commission finds as fact that plaintiff's problems were "not recurrent stenosis or recurrent disc herniation." Dr. Hadar opined and the Full Commission so finds that plaintiff's 2007 symptoms were not related to his surgical treatment or to the initial, presenting problem, which had caused the need for surgery.
30. Plaintiff continues to work for defendant-employer as a cashier earning more than his pre-injury wages.
31. As a result of his admittedly compensable injury plaintiff was incapable of working from August 27, 2002 to November 11, 2002 and partially incapable of working for 4 weeks thereafter. The greater weight of the evidence further establishes that plaintiff was incapable of working from July 28, 2004 through December 1, 2004 and from September 1, 2005 through October 18, 2005 and that his incapacity to work was causally related to the same condition to his back for which defendants admitted compensability. Defendants have failed to rebut Plaintiff's presumption that the back condition for which he received treatment at UNC Hospitals and subsequently underwent surgery by Dr. Hadar is related to his compensable back injury.
32. Although plaintiff's post-injury job with defendant-employer as a bookstore cashier is slightly different than his pre-injury job as a general bookstore worker, his job as a cashier pays *Page 12 
him as much or more than his pre-injury wages and is not so modified that it is not a position that is readily available in the competitive labor market.
33. Plaintiff failed to timely seek approval for the surgery done by Dr. Hadar and for his treatment at UNC from defendants or the Industrial Commission. There is no indication from the evidence that defendants would have denied a request for treatment at UNC. Although plaintiff may have had some reasonable belief that he needed to direct his own medical care because he did not obtain a satisfactory outcome from his prior treatment, he failed to avail himself of the remedy of seeking approval for a change of treatment or change of physician from the Industrial Commission. Based upon the evidence presented, plaintiff believed that his need for treatment at UNC was related to his compensable injury. His resort to self directed medical treatment appeared to be due to frustration with the results obtained from his authorized medical treatment.
34. The Full Commission is unable to find in the record a motion for approval of the unauthorized treatment or evidence that plaintiff submitted the bills for such treatment to defendants for approval. Plaintiff contends that raising in the Pre-Trial Agreement the issue of whether the back surgery he underwent with Dr. Hadar was work related, is a request for approval of the treatment. The Full Commission finds that the Pre-Trial Agreement is dated October 31, 2007 and even if arguably this issue statement is sufficient notice of plaintiff's intent, the notice is still almost three years after plaintiff sought unauthorized medical treatment. The Full Commission therefore finds that plaintiff did not seek timely approval of the surgery by Dr. Hadar or the treatment by other medical providers at UNC Hospitals or offer a reasonable excuse for such failure. *Page 13 
35. Defendants are not required to pay for such treatment because it does not appear from the evidence that plaintiff sought approval from the Industrial Commission or defendants within a reasonable time.
36. Neither party pursued any issue in this matter in an unreasonable manner or without reasonable ground.
37. Defendants are obligated to pay indemnity compensation for plaintiff's disability resulting from the surgery performed by Dr. Hadar and during the period when plaintiff was unable to work due to the surgery.
38. Even though a herniated disc was first diagnosed in 1995 by Dr. Fulghum after plaintiff's first back injury, the condition resolved and the evidence indicates that plaintiff did not experience any significant problems until after his subsequent injury in November 1999. The Full Commission is not further addressing the issue of payment for the 5% rating to plaintiff's back from the 1995 injury resulting in a diagnosed herniated disc at L5-S1 or whether that matter is still open.
 ***********
Based on the foregoing findings of fact the Full Commission enters following:
 CONCLUSIONS OF LAW
1. On or about November 8, 1999, plaintiff sustained an admittedly compensable back injury due to a specific traumatic incident arising out of and in the course of his employment with defendant-employer. Defendants filed a Form 60 on November 4, 2002 admitting compensability for "nerve damage back" for this injury. N.C. Gen. Stat. § 97-2(6). Defendants admitted that disability began on August 27, 2002. N.C. Gen. Stat. § 97-29. *Page 14 
2. Given the credible medical and vocational evidence of record, and as a result of his admittedly compensable injury, plaintiff was temporarily totally disabled from the admitted period from August 27, 2002 through November 11, 2002 and, to the extent that it has not been paid pursuant to the Form 60 filed in this matter, plaintiff is entitled to temporary total disability compensation at the rate of $236.48 per week for this period. Plaintiff was also temporarily totally disabled from work during the period he was removed from work by Dr. McConville at Sandhills due to his work related back condition from July 28, 2004 through December 1, 2004 and during the period of time he was removed from work after the surgery by Dr. Hadar from September 1, 2005 through October 18, 2005. Plaintiff was incapable of working due to his work related medical condition and was removed from work by treating physicians during these periods and has therefore proven disability for these periods. N.C. Gen. Stat. § 97-29, Russell v. Lowes Product Distribution 108 N.C.App. 762,425 S.E.2d 454 (1993).
3. Given the credible medical and vocational evidence of record, and as a result of his admittedly compensable injury, plaintiff was temporarily partially disabled for four weeks following his November 11, 2002 return to work on a graduated schedule and is entitled to weekly temporary partial disability compensation benefits at a rate of two-thirds of the difference between $354.69 and the weekly wages he was able to earn subsequent to his return to work with defendant-employer from November 11, 2002 and continuing for the 4 weeks that he earned reduced wages. N.C. Gen. Stat. § 97-30.
4. With respect to the payment of medical expenses for plaintiff's back condition subsequent to the filing of the Form 60, the Parsons
presumption applies." Perez v. American Airlines, 174 N.C. App. 128,620 S.E.2d 288 (2005); Parsons v. Pantry, Inc., 126 N.C. App. 540,485 S.E.2d 867 (1997). The Form 60 in this case admits an injury resulting in nerve damage *Page 15 
back. Defendants have not rebutted the presumption that the medical treatment plaintiff received for his back subsequent to the filing of the Form 60 through October 18, 2005, when Dr. Hadar released him to return to work without restrictions, is related to the compensable injury. Defendants have proven that the medical treatment plaintiff received in July 2007 was not related to his compensable injury.Id.
5. Generally defendants have the right to direct medical care once they accept a claim as compensable. This right to direct medical care includes the right to select the treating physician and/or surgeon. N.C. Gen. Stat. § 97-25, Schofield v. Tea Co., 299 N.C. 582; 264 S.E.2d 56
(1980). An employee may select a physician of his own choosing, subject to approval of the Industrial Commission. The approval of the Commission must be obtained within a reasonable time after an employee has selected a physician of his own choosing to assume treatment, but not prior to services. Forrest v. Pitt County Board of Education, 100 N.C. App. 119;394 S.E.2d 659 (1990).
6. The Full Commission has found herein that plaintiff did not seek approval of the medical treatment provided by Dr. Hadar and through UNC Hospitals in a reasonable time. The Full Commission herein has also found that such treatment, including the surgery, was causally related to, and necessitated by plaintiff's November 8, 1999 compensable injury and that the treatment and surgery did tend to effect a cure, provide relief and/or lessen the period of plaintiff's disability. However, since plaintiff did not seek approval for the medical treatment he received at UNC hospitals and through Dr. Hadar within a reasonable time, defendants are not responsible for the medical expenses for such treatment. Although defendants are not required to pay for this unauthorized treatment for the reasons stated herein, they are obligated to pay indemnity compensation for the period plaintiff was removed from work by Dr. Hadar due to the surgery. *Page 16 
"The fact that a physician is not authorized by the Commission means that the employer and carrier cannot be required to pay for treatment by that physician. . . . It does not render the physician's evidence incompetent."Branch v. Carolina Shoe Co., 172 N.C.App. 511, 616 S.E.2d 378 (2005);Kanipe v. Lane Upholstery, 141 N.C. App. 620, 627, 540 S.E.2d 785, 790
(2000); N.C. Gen. Stat. § 97-25.
7. As a result of his compensable injury, plaintiff has a three percent (3%) permanent partial disability of his back, for which he is entitled to compensation at the rate of $236.48 per week for a period of 9 weeks. N.C. Gen. Stat. § 97-31(23).
8. Plaintiff's post-injury job as a cashier pays him as much or more than his pre-injury wage and is not so modified that it is not readily available in the competitive labor market. Plaintiff's earnings in his cashier's job is indicative of his wage earning capacity in the competitive job market. Peoples v. Cone Mills Corp., 316 N.C. 426,342 S.E.2d 798 (1986).
9. Because neither party pursued any issue in this matter in an unreasonable manner or without reasonable grounds, neither party is entitled to attorney's fees as a sanction. N.C. Gen. Stat. § 97-88.1.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff temporary total disability compensation at the rate of $236.48 per week for the period from August 27, 2002 through November 10, 2002, from July 28, 2004 through December 1, 2004 and from September 1, 2005 through October 18, 2005. Defendant shall receive a credit for temporary total disability compensation already paid. Those payments that have accrued shall be paid in a lump sum, subject to the attorney's fee approved below.
2. Defendants shall pay to plaintiff, subject to the attorney's fee approved below, temporary partial disability compensation at a rate of two-thirds the difference between $354.69 and the weekly wage he was able to earn subsequent to his return to work with defendant-employer on a graduated schedule for the 4 weeks that he earned reduced wages. Those *Page 17 
payments that have accrued shall be paid in a lump sum, subject to the attorney's fee approved below.
3. For the three percent (3%) permanent partial disability of his back, defendants shall pay permanent partial disability compensation to plaintiff at the rate of $236.48 per week for a period of 9 weeks. This amount shall be paid in a lump sum.
4. Defendants are not required to pay for the unauthorized medical treatment plaintiff received at UNC Hospitals and by Dr. Hadar beginning December 3, 2004. Defendants are obligated to pay for the medical treatment plaintiff received through Sandhills Family Practice, which was related to his compensable injury and for all medical treatment rendered by and through authorized treating physicians.
5. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff under paragraphs 1, 2, and 3 of this Award is approved for plaintiff's counsel and shall be deducted from the compensation due plaintiff and paid directly to plaintiff's counsel.
7. No attorney's fees under N.C. Gen. Stat. § 97-88.1 are appropriate to be awarded in this matter.
8. Defendants shall pay the costs.
 This the ___ day of January 2009. *Page 18 
S/__________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/__________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/__________________ DANNY L. McDONALD COMMISSIONER